## 23-1107

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
### *for the*
# 𝔉𝔬𝔲𝔯𝔱𝔥 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

KRISTEE ANN BOYLE, Mother of Peyton Alexander Ham and as personal representative of his estate,

*Plaintiff/Appellant,*

— v. —

JOSEPH CHARLES AZZARI, JR.,

*Defendant/Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT GREENBELT

## **APPELLANT'S OPENING BRIEF**

CHRISTOPHER T. LONGMORE
DUGAN MCKISSICK & LONGMORE LLC
22738 Maple Road
Suite 210
Lexington Park, Maryland 20653
(301) 862-3764

*Counsel for Appellant*

CP COUNSEL PRESS • VA – (804) 648-3664

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 23-1107 _____   Caption: Boyle v. Azzari _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

Kristee Ann Boyle, Individually and as Personal Representative of the Estate of Peyton Ham
(name of party/amicus)

_____

who is _____ Appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations?  ☐ YES ☑ NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?   ☐YES ☑NO
If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?   ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?   ☐YES ☒NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____    Date: _____2/13/23_____

Counsel for: __Kristee Ann Boyle_____

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iii

STATEMENT OF JURISDICTION ....................................................1

ISSUES PRESENTED FOR REVIEW ...............................................1

STATEMENT OF CASE ......................................................................3

    Relevant Factual Background..........................................................3

    Procedural Background ....................................................................8

SUMMARY OF ARGUMENT ............................................................8

ARGUMENT .......................................................................................9

    A.    Standard of Review ................................................................9

            1.    Motion to Dismiss....................................................9

            2.    Motion for Summary Judgment...............................10

    B.    Argument...............................................................................11

            1.    The District Court Committed Clear Legal Error Because It Did Not Apply the Correct Legal Standard in its Determination of Whether Appellee Joseph Charles Azzari Used Excessive Force When He Shot Sixteen-Year-Old Peyton Ham ...............................................11

            2.    There are Disputes of Material Fact that Require the Denial of Appellee's Motion to Dismiss, or in the Alternative for Summary Judgment, and Therefore the District Court Should Have Denied Appellee's Motion for Summary Judgment...........................................18

3.    The District Court Prematurely Ruled on Appellee's Motion without Providing the Appellant with an Opportunity to Conduct Reasonable Discovery in this Case ............................................................................23

CONCLUSION ....................................................................28

STATEMENT IN SUPPORT OF ORAL ARGUMENT ........................................29

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)........................................................................10

*Anderson v. Russell*,
   247 F.3d 125 (4th Cir. 2001).....................................................11, 26, 22, 27

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)........................................................................10

*Brockington v. Boykin*,
   637 F.3d 503 (4th Cir. 2011).............................................................*passim*

*Estate of Jones v. City of Martinsburg*,
   726 F. App'x 173 (4th Cir. 2018) ..............................................................16

*Estate of Jones v. City of Martinsburg*,
   961 F.3d 661 (4th Cir. 2020)............................................................16, 17, 28

*Evans v. Techs. Applications & Serv. Co.*,
   80 F.3d 954 (4th Cir. 1996)...................................................................10

*Harris v. Pittman*,
   927 F.3d 266 (4th Cir. 2019)..........................................................1, 2, 25, 28

*Ibarra v. United States*,
   120 F.3d 472 (4th Cir. 1997)..................................................................10

*Libertarian Party of Va. v. Judd*,
   718 F.3d 308 (4th Cir. 2013)..................................................................10

*Mercantile Peninsula Bank v. French*,
   499 F.3d 345 (4th Cir. 2007)..................................................................11

*Meyers v. Balt. Cty.*,
   713 F.3d 723 (4th Cir. 2013)..................................................................15

*Presley v. City of Charlottesville*,
    464 F.3d 480 (4th Cir. 2006) ............................................................. 9

*Saucier v. Katz*,
    533 U.S. 194 (2001) ........................................................................ 15

*Sigman v. Town of Chapel Hill*,
    161 F.3d 782 (4th Cir. 1999) .......................................... 11, 21, 27

*Tennessee v. Garner*,
    471 U.S. 1 (1985) ............................................................................ 15

*Waterman v. Batton*,
    393 F.3d 471 (4th Cir. 2005) ......................................... 12, 14, 15

*Wilson v. Prince George's County*,
    893 F.3d 213 (4th Cir. 2018) .......................................................... 17

## CONSTITUTIONAL PROVISION

U.S. Const. amend. IV ...................................................... 11, 20, 21

## STATUTES

4th Cir. L.R. 34(a) ................................................................. 29

28 U.S.C. § 1291 ..................................................................... 1

28 U.S.C. § 1331 ..................................................................... 1

42 U.S.C. § 1983 ............................................................ *passim*

## RULES

Fed. R. Civ. P. 12(b) ............................................................... 2

Fed. R. Civ. P. 12(b)(6) ........................................................... 9

Fed. R. Civ. P. 56 .................................................................... 2

Fed. R. Civ. P. 56(a) ................................................................10

Fed. R. Civ. P. 56(d) ...............................................3, 9, 11, 23

## STATEMENT OF JURISDICTION

Appellant Kristee Boyle, individually and as Personal Representative of her son, Peyton Ham's, estate, filed this action alleging violation of her son's civil rights under 42 U.S.C. § 1983.  The United States District Court for the District of Maryland exercised subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 which grants federal question jurisdiction to District Courts of the United States.

The Court of Appeals for the Fourth Circuit has appellate jurisdiction pursuant to 28 U.S.C. § 1291 which grants appellate review of final decisions of District Courts of the United States.

Counsel certifies that the instant appeal arises from a final decision of the District Court. The District Court entered an Order of Court and accompanying Memorandum Opinion, both dated January 10, 2023, granting the Motion to Dismiss, or in the alternative for Summary Judgment of the Appellee, Joseph Charles Azzari. JA160 and JA150-JA159.  The notice of appeal was filed on January 25, 2023.  JA161.

## ISSUES PRESENTED FOR REVIEW

1.     Did the District Court err when it found that Appellee Joseph Charles Azzari ("Appellee") did not use excessive force, even though sixteen-year-old Peyton Ham was critically wounded, on his knees approximately fifteen to twenty-

five feet from Appellee and posed no threat to Appellee or anyone else at the time

Appellee Joseph Charles Azzari shot and killed sixteen-year-old Peyton Ham?

2.     Did the District Court err when it granted summary judgment[1] in

favor of Appellee Joseph Charles Azzari, despite the fact that there are clear and

genuine disputes of material facts as to whether Appellee Joseph Charles Azzari

used excessive force and was not entitled to qualified immunity when he shot

sixteen-year-old Peyton Ham when Peyton was critically wounded, on his knees

approximately fifteen to twenty-five feet from Appellee and posed no threat to

Appellee or anyone else?

3.     Did the District Court err when it failed to defer on its consideration

and ruling on the Motion to Dismiss, in the alternative for Summary Judgment,

until Appellant Kristee Boyle had the opportunity to exercise her rights under the

---

[1] The Motion that gave rise to this appeal is set forward as a Motion to Dismiss, or in the Alternative for Summary Judgment. JA17. However, in his Memorandum in Support of his Motion, Appellee sought only summary judgment as to Count 1 on of the Complaint. JA7. Count 1 is a count brought by Appellant Kristee Boyle, individually and as Personal Representative of her minor child's estate, seeking relief under 42 U.S.C. § 1983 for the excessive force employed by the Appellee. JA10-JA11. The Appellee sought dismissal or summary judgment as to the remaining state tort claims (Count 2 – 4) and the survival action claim (Count 5). JA14-JA19. While the District Court Order does not specify whether the Court granted dismissal under Rule 12(b) or summary judgment under Rule 56, it is clear from the District Court's Memorandum that it treated the entire motion as a motion for summary judgment and, accordingly, Appellant's arguments herein are based in the incorrect application of the summary judgment standards in the District Court's Order and Memorandum.

discovery rules of the Federal Rules of Civil Procedure pursuant to F.R.C.P. Rule 56(d)?

## STATEMENT OF CASE

**Relevant Factual Background**

Appellant filed her Complaint in this matter on or about April 12, 2022. This Complaint appropriately set forth the facts necessary to support and specify all claims in the Complaint. JA5-JA15. However, as set forth above, the District Court treated Appellee's Motion as a motion for summary judgment. Thus, the following is a recitation of the facts relevant to the present case. The events that took place on April 13, 2021 include two separate series of actions by Appellee Azzari. First, Appellee Azzari fired multiple shots at Peyton Ham initially wounding him and partially incapacitating him to the extent that he fell to the ground and eventually took a kneeling position. The second series of actions involve Appellee Azzari firing multiple shots at Peyton Ham approximately fifty-seven seconds later as Peyton Ham was wounded, kneeling on the ground at least

fifteen feet away[2] from Appellee Azzari.[3]  The second round of shots that Appellee

Azzari fired at Peyton Ham are the actions that most clearly violated Peyton Ham's

constitutional rights and there are clear disputes of material facts relating to that

second series of actions.  As set forth below, this Court has made it clear that even

if a lower court determines that the initial use of force was legitimate, a person has

a clearly established right to be free from excessive force even seconds after the

reason for the initial use of force has dissipated.

A critical determination that a jury should be given the opportunity to decide

in this case is whether Appellee Azzari *reasonably* believed he was in danger when

he fired the second round of shots at sixteen-year-old Peyton Ham.  The actions, or

inactions, of Peyton Ham in the moments immediately before that second round of

shots are obviously critically important to that determination.  One fact very

relevant to this analysis is whether Peyton Ham was walking toward Appellee

---

[2] Appellant has had the chance to measure the distance from where her son was shot to where she understands the shell casings appear to have been recovered, as well as review aerial photos she has obtained, and from her review believes the actual distance was approximately seventeen feet or further between the Appellee and Peyton Ham when the Appellee fired the second round of shots killing Peyton Ham, as set forth in her Memorandum before the District Court and accompanying Declaration.  *See* JA133-134.

[3] This time gap is derived from a home video camera recording from a neighbor's house on the date of the incident.  This camera did not record any relevant video images, but the audio portion of the video reveals the sound of eleven (11) initial shots, a delay of fifty-seven seconds, and then the firing of an additional four (4) shots.  A copy of this video was included as an exhibit to the Appellant's Opposition to Appellee's Motion for Summary Judgment as Exhibit A.  *See* JA72.

Azzari in a threatening manner with a knife in his hand. There is a clear dispute of this material fact and the District Court should have looked no further than Appellee Azzari's own Memorandum and statements to identify this dispute. Appellee Azzari has set forth two different versions of what actions Peyton Ham took immediately before Appellee shot Peyton Ham to death. This is an incredibly clear example of a material fact in dispute.

In his most recent description of these actions, Appellee Azzari included a written declaration as Exhibit 1 to his Memorandum in Support of his Motion to Dismiss, dated July 18, 2022, and signed "under penalty of perjury."[4] See JA40-43. In that statement, Appellee Azzari, inter alia, discusses his claimed reason for unleashing the second barrage of shots at Peyton Ham on April 13, 2021. In paragraph 10 of the July 18, 2022 written declaration, Appellee Azzari states: "I repeatedly told Mr. Ham to drop the knife as I tried to back away from him. Mr. Ham said 'I want to die' several times. He stood up with the knife in his hand *and took a step toward me*. At this point, Mr. Ham was approximately fifteen (15) feet from me. Fearing for my safety, I discharged my weapon several times." JA40-43 (emphasis added).

---

[4] Appellant first received this July 18, 2022 written declaration when her counsel was electronically served with the Motion to Dismiss on July 18, 2022.

However, Appellee Azzari also gave a recorded statement on April 19, 2021, just six (6) days after Appellee Azzari tragically shot and killed Peyton Ham. Appellee describes these critical facts differently in that statement. *See* JA73. Appellant's understanding is that this statement was made during the Maryland State Police's investigation and its review of the events that gave rise to this case. During that April 19, 2021 statement, Appellee Azzari twice provided a summary of the events that occurred on April 13, 2021. During those statements, Appellee Azzari never stated or claimed that Peyton Ham took any steps toward him. Instead, Appellee Azzari described that after he initially shot Peyton Ham, Peyton dropped to his knees. Appellee Azzari claims he saw a knife in Peyton Ham's hand and stated that "[t]he subject began to stand up, still grasping the knife in his left hand, at which time I discharged my weapon." JA89-JA91. Appellee Azzari repeatedly stated that Peyton Ham attempted to get up, but never stated that Peyton actually stood up before he shot him. Likewise, Appellee Azzari never stated that Peyton Ham took a step toward him before he fired the second round of shots, killing Peyton Ham. The inconsistencies in the two statements of the Appellee in and of itself demonstrates a dispute of a material fact because these are the very actions described by the Appellee in his July 18, 2022 statement that made him "fear[] for his safety." JA40-JA43. Likewise, it raises a serious question about the

veracity of the more recent statement (one that is more favorable to his defense in this action) and in turn Appellee Azzari's credibility with regard to that statement.

There were also eyewitnesses to the shooting. These eyewitnesses include Michelle Mills and her daughter, Allison Mills, who were in the house on the property where the shooting took place at the time of the incident. Both of these individuals were interviewed by the Maryland State Police shortly after the incident and this interview was recorded. A copy of this recording was included with Appellant's Opposition to the Motion for Summary Judgment as Exhibit C.[5] *See* JA102. During those interviews, the witnesses clearly stated that once Peyton Ham was wounded and on his knees, he never stood again. Michelle Mills took a photograph of when she first looked out her window, showing Peyton Ham kneeling and likewise showing the Appellee. JA103. When asked by one of the Maryland State Police officers conducting the interview "Did he ever stand up?", Michelle Mills stated "no." (at minutes 6:19 – 6:49 of the recorded interview). This description of the events directly contradicts Appellee Azzari's latest description that Peyton Ham "took a step toward" him because, obviously, if Peyton Ham was kneeling and never stood up, he could not take a step toward the Appellee. Michelle Mills also gave a written a statement to the Maryland State

---

[5] An electronic copy of this recording was sent to Counsel for Appellee contemporaneously to the filing and service of Appellant's Opposition. Likewise, a copy of that recording was mailed to the District Court.

Police.  JA104.  As can be seen from a review of this statement, there is no

mention or indication that Peyton Ham ever stood up or took a step toward

Appellee Azzari after the first round of shots.

**Procedural Background**

Appellant filed her Complaint on or about April 12, 2022.  JA5-16.

Appellee filed its Motion to Dismiss or in the Alternative for Summary Judgment

on or about July 18, 2022, which Appellant Opposed and Appellee filed a Reply.

JA17, JA50 and JA137.  Without holding a hearing, the District Court entered an

Order and accompanying Memorandum granting summary judgment in favor of

Appellee as to all counts in Appellant's Complaint on January 10, 2023.  JA160,

JA161.  Appellant filed her notice of appeal on January 25, 2023.  JA161.

**SUMMARY OF ARGUMENT**

The District Court erred when it applied the incorrect legal standard to the

Appellee's Motion for Summary Judgment.  The most prominent legal error is that

the District Court completely ignored the clearly established recent Fourth Circuit

case law which prohibits police officers from continuing to use deadly force after a

reasonable officer would believe that the danger no longer existed.

In addition, as demonstrated in the written filings for the Motion for

Summary Judgment that are part of the record and included in the Appendix, there

are clear and genuine disputes of material fact that require the Appellee's Motion

8

for Summary Judgment to be denied on remand.  The most notable dispute of material fact is whether sixteen-year-old Peyton Ham was on his knees and bleeding from multiple gunshot wounds when Appellee fired a second round of shots that killed Peyton or whether Peyton stood up and took a step toward Appellee before the second round of shots.

The District Court also committed clear legal error when it refused to give the Appellant the opportunity to conduct reasonable discovery in this matter before ruling on Appellee's Motion for Summary Judgment pursuant to F.R.C.P. Rule 56(d).

For these reasons, this Honorable Court should reverse the January 10, 2023 Order of the District Court and remand this case with instructions to deny the Motion for Summary Judgment so this case can proceed with discovery and the eventual jury trial of the issues raised in Appellant's Complaint.

## ARGUMENT

### A.    Standard of Review

#### 1.    Motion to Dismiss

A motion brought pursuant to Rule 12(b)(6) tests the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). The Court accepts "the well-pled allegations of the complaint as true," and construes all facts and reasonable inferences most favorably to the plaintiff. *See*

9

*Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). To survive a motion to dismiss, the complaint's factual allegations "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).[6]

## 2.    Motion for Summary Judgment

This Court reviews a grant of summary judgment de novo. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958 (4th Cir. 1996). Summary judgment is appropriate only when "there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (internal quotation marks omitted). "A fact is material if it 'might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). This Court is "required to view the facts and all justifiable inferences arising therefrom in the light most favorable to the nonmoving party . . . ." *Id.* at 312. In conducting its review, this Court must not

---

[6] This Standard of Review is provided in an abundance of caution as the Appellee's Motion was captioned as a Motion to Dismiss or the in the alternative as a Motion for Summary Judgment. As set forth in Footnote 1 above, the District Court treated the Appellee's Motion as a Motion for Summary Judgment and therefore the proper standard of review is set forth below in subsection (b).

weigh evidence or make any credibility determinations. *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007).  Fed. R. Civ. P. 56(d) provides that when facts are unavailable at the time of a Motion for Summary Judgment, "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations to take discovery; or (3) issue any other appropriate order."

**B.    Argument**

**1.    The District Court Committed Clear Legal Error Because It Did Not Apply the Correct Legal Standard in its Determination of Whether Appellee Joseph Charles Azzari Used Excessive Force When He Shot Sixteen-Year-Old Peyton Ham.**

The primary finding by the District Court in its Memorandum Opinion was the finding that the Appellee "acted reasonably in using deadly force and there was no violation of the Decedent's Fourth Amendment Constitutional right." JA157. The District Court relied on only two Fourth Circuit cases in reaching its conclusion, namely *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 788 (4th Cir. 1999), and *Anderson v. Russell*, 247 F.3d 125, 132 (4th Cir. 2001).  *Id.*  In doing so, the District Court failed to address more recent case law that supported the denial of the motion and most, importantly, completely ignored the clearly established recent Fourth Circuit case law which prohibits police officer from continuing to use deadly force after a reasonable officer would believe that the

danger no longer existed. The District Court's failure to apply this case is clear error and warrants the reversal of the District Court's January 10, 2023 Order granting summary judgment in this case.

The recent case of *Harris v. Pittman*, 927 F.3d 266 (4th Cir. 2019) is particularly applicable to this Court's consideration of the District Court's Opinion and Order that dismissed the Appellant's Complaint. In *Harris*, the Fourth Circuit reversed the granting of a summary judgment not once, but twice, because "even where an initial use of deadly force is reasonable, the repeated use of force may be constitutionally excessive if circumstances change in a material way." *Id.* at 268 – 269, (*quoting Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005)). The facts in that case revolved around a chase involving a suspected criminal, Herman Harris, by a police officer, Zachary Pittman. Officer Pittman caught up to Mr. Harris and a "hand-to-hand" struggle ensued. This struggle included the firing of tasers by each of the individuals at each other and then both individuals fighting for control of Officer Pittman's firearm. The firearm initially discharged while it was in Officer Pittman's holster during the struggle. Officer Pittman alleged that Mr. Harris gained control of the firearm and attempted to shoot Officer Pittman in the face, but the firearm malfunctioned, and Officer Pittman regained control of the firearm and shot Mr. Harris in the chest. Mr. Harris agreed in the case that the first shot to his chest was justified.

Officer Pittman then fired and additional three shots at Mr. Harris while the two parties were only a "few feet" away from each.  Officer Pittman claimed that he feared for his life because he saw Mr. Harris standing a few feet away him, while Officer Pittman was still on the ground, and he feared another attack and therefore shot Mr. Harris.  Mr. Harris claimed that he in fact was on the ground severely wounded, and that Officer Pittman "then got to his feet and stood over Harris, who was not trying to escape, nor … showing any further resistance, and Officer Pittman then shot him two additional times."  *Id.* at 270.  The District Court granted summary judgment in favor of Officer Pittman.  In its opinion, the Fourth Circuit noted that "[t]he only issue on appeal is whether, at this early stage of the litigation and before a jury has had a chance to assess witness credibility and other evidentiary issues, it can be said that Pittman is entitled to qualified immunity as a matter of law.  We conclude that genuine factual disputes bearing directly on Pittman's qualified immunity defense preclude the award of summary judgment…."  *Id.* at 271.

A significant part of the Fourth Circuit's analysis in *Harris* was the treatment of the first shot, and the following two or three shots, as two separate instances.  Even with the undisputed facts that the two parties had been immediately engaged in a hand-to-hand struggle before the second round of shots and that they had been struggling to gain control over Officer Pittman's firearm,

13

the Fourth Circuit found that the first shot and the following shots had to be analyzed as two separate events. The Court noted that Fourth Circuit case law "insists that 'the reasonableness of force employed can turn on a change of circumstances during an encounter lasting only a few seconds.'" *Id.* at 272 (*quoting Waterman*, 393 F.3d at 481). The Fourth Circuit also referenced the case of *Brockington v. Boykins* as part of its analysis, noting the "parsing sequence of shots and finding that safety risk that justified initial shots did not justify subsequent shots once suspect, wounded, had fallen to the ground." *Id.* at 274 (*citing Brockington v. Boykin*, 637 F.3d 503 (4th Cir. 2011).

The Fourth Circuit also took great lengths to confirm that a District Court is required to "view the facts in the light most favorable to the plaintiff and to draw all inferences in the plaintiff's favor." *Id.* at 278. It found that the District Court had not construed the facts pursuant to this standard in the *Harris* case and therefore found that the District Court erred in granting summary judgment in favor of Officer Pittman. However, the Fourth Circuit continued it analysis, reviewing the salient facts in that case in favor of Mr. Harris, to determine if Officer Pittman was entitled to qualified immunity as a matter of law. The Fourth Circuit also engaged in the two-step process described above. The first step is to determine "'whether the facts alleged or shown, taken in the light most favorable to the plaintiff, establish that the police officer's actions violated a constitutional

right.'  At step two, the question is whether the right at issue was 'clearly established' at the time of the officer's conduct." *Id.* at 279 (*quoting Meyers v. Balt. Cty.*, 713 F.3d 723, 731 (4th Cir. 2013) and *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  As to the first step, the Fourth Circuit considered Mr. Harris's claim "that once he had been knocked to the ground with a gunshot wound to this chest, the justification for Pittman's initial shot . . . was neutralized.  At that point, a 'reasonable officer' no longer 'would have probable cause to believe that Harris posed a significant threat of death or serious physical injury, rendering Pittman's final two shots objectively unreasonable and thus constitutionally excessive." *Id.* at 279 (internal quotation omitted and *citing Tennessee v. Garner*, 471 U.S. 1, 3, 11 – 12 (1985).   The Fourth Circuit found that a reasonable jury could agree with Mr. Harris' claims and reach the same conclusion when viewing the record in the light most favorable to Mr. Harris.  As to the second step, the Fourth Circuit reviewed the *Waterman* and *Brockington* cases, and confirmed the "clearly established right of a suspect, once shot by an officer and lying wounded on the ground, not to be shot again." *Id.* at 281 (*quoting Brockington*, 637 F.3d at 508). The Fourth Circuit concluded its holding by stating that "even where deadly force initially is justified by a significant threat of death or serious physical injury, a police officer may not continue to employ deadly force when the circumstances change so as to eliminate the threat." *Id.*

Even though the *Harris* case was cited and briefed the District Court, the District Court failed to even consider the *Harris* case and the other related cases cited above, committing clear legal error. In addition, the more recent Fourth Circuit opinion of *Estate of Jones v. City of Martinsburg*, 961 F.3d 661 (4th Cir. 2020) further described how District Court's should apply the holdings of *Brockington* requiring officers to refrain from employing deadly force once an initial threat has been neutralized. The *Jones* opinion involved a case involving "Wayne Jones, a black man experiencing homelessness, was stopped by law enforcement in Martinsburg, West Virginia . . . [a]rmed only with a knife tucked into his sleeve, he was tased four times, hit in the brachial plexus, kicked, and placed in a choke hold. In his final moments, he lay on the ground between a stone wall and a wall of five police officers, who collectively fired 22 bullets." *Id.* at 663 – 664. In applying holding of *Brockington* to the facts of that case, the Fourth Circuit found that the District Court in *Jones* "had ignored 'discrepancies among the officers' accounts'; and assumed that Jones presented an ongoing threat as he lay on the ground because he still had the knife. We concluded that a reasonable jury could find excessive force, because 'it is not clear that Jones continued to pose an immediate 'threat of physical harm to the officers at the time they shot and killed him...." *Id.* at 666 - 667, quoting *Estate of Jones v. City of Martinsburg*, 726 F. App'x 173, 179 (4th Cir. 2018). The *Jones* opinion further referenced

16

*Brockington* noting that "[b]y shooting an incapacitated, injured person who was not moving, and who was laying on his knife, the police officers crossed a 'bright line' and can be held liable. Indeed, it is just common sense that [shooting] someone who is already incapacitated is not justified under these circumstances." *Id.* at 670 *quoting Brockington*, 637 F.3d at 508 and *Wilson v. Prince George's County*, 893 F.3d 213 (4th Cir. 2018).  The *Jones* opinion reached the conclusion that "[g]iven the relatively inaccessible location of the knife, and the physical inability to wield it given his position on the ground, the number of officers on Jones, and Jones's physical state by this time, it would be particularly reasonable to find that Jones was secured while still armed."  *Id.* at 669.

Similar to the facts of the *Jones* case, Peyton was physically incapacitated at the time Appellee fired his second round of shots because Appellee had already shot sixteen-year-old Peyton Ham several times approximately one minute before. As can be seen in the photo included with Appellant's Opposition to the Motion for Summary Judgment, another office responding to the scene was only seconds away from the place where Appellee shot and killed Peyton.  As was the case in *Jones*, a jury could reasonably conclude that Peyton was "secured" at the time Appellee fired the second round of shots and that Appellee and the other officers who were on scene seconds after Appellee fired the second shots "could have disarmed [Peyton] and handcuffed him" instead of killing sixteen-year-old Peyton

17

Ham.  *Id.*  By ignoring the abundant case law differentiating between actions

taken upon an initial threat and actions taken once that initial threat was

neutralized, the District Court committed clear legal error resulting in Appellant

not having the opportunity have a jury decide if Appellee acted reasonably when

he fired the second round of shots.

> **2.    There are Disputes of Material Fact that Require the Denial of Appellee's Motion to Dismiss, or in the Alternative for Summary Judgment, and Therefore the District Court Should Have Denied Appellee's Motion for Summary Judgment**

The District Court also committed clear legal error because it ignored the

fact that there are obvious disputes of material facts in this case and therefore the

granting of summary judgment in favor of the Appellee was impermissible under

the Court's summary judgment standards.  The District Court summarized it

consideration of whether there are materials facts in dispute on pages 7 – 8 of its

Memorandum Opinion.  JA156-JA157.  The only two facts relied upon by the

District Court was that Peyton Ham was "armed with a knife" and was

"approximately twenty-five feet away from the Defendant", "immediately after

pointing a firearm at him."  *Id.*  First, as set forth above, the facts are undisputed

that the second shooting of Peyton Ham was not immediately after he "brandished"

a toy gun and the Appellee initially shot and significantly incapacitated Peyton

Ham.  Instead, there was close to a full minute during which the Appellee had time

to back away from Peyton Ham while he was kneeling on the ground, seriously

wounded and bleeding from his multiple gunshot wounds. In doing so, the Court

clearly shows it ignored the case law described above. In reaching its decision, the

District Court found that a police officer can shoot a person any time if they have a

knife and are fifteen to twenty-five feet away from the officer, because the District

Court found these were the only material facts in this case. This is a clear legal

error based on the reasoned analysis a District Court is required to make under the

jurisprudence cited above.

When reviewing all the relevant facts, there are clear disputes about the

material facts in this case regarding the question of whether Appellee Azzari's

actions were objectively reasonable considering the totality of facts and

circumstances surrounding his actions when he fired the second round of shots.

Appellee Azzari, in his Memorandum in support of his Motion for Summary

Judgment, stated the facts he relies upon in claiming he feared for his safety. He

states, "Mr. Ham then stood up with the knife his hand *and took a step towards

TFC Azzari*." TFC Azzari, who at this point was only fifteen (15) feet away, again

feared for his life and fired his weapon several more times towards Mr. Ham."

JA28. As set forth above, these facts relied upon by Appellee Azzari are clearly in

dispute. Witnesses at the scene stated that Peyton Ham never stood up and

certainly did not take a step towards Appellee Azzari. Further, Appellee Azzari

himself did not claim that Peyton Ham stood or took a step toward him when he

19

was interviewed six days after the incident. A jury could clearly find that it is excessive force to shoot a wounded, sixteen-year-old boy who is kneeling and at least fifteen feet from an officer and that a reasonable officer would not have fired the second round of shots.

This is particularly true when considering the Fourth Circuit's recent *Harris* opinion. As in *Harris*, this Court is required to view the facts in a light most favorable to the Appellant. Given the almost one minute delay between the two rounds of shots filed by Appellee Azzari, and the fact that Peyton Ham was wounded and kneeling at the time Appellee Azzari fired his second round of shots, a reasonable jury could certainly find that the second round of shots violated Peyton Ham's constitutional right under the Fourth Amendment to the Constitution prohibiting excessive force by a police officer in effectuating an arrest or other seizure of a person. Likewise, a reasonable jury could find that Appellee Azzari's second round of shots violated the "clearly established right of [Peyton Ham], once shot by an officer and lying wounded on the ground, not to be shot again." *Harris*, 927 F.3d at 281.

One of the two cases relied upon by the District Court was the case of

*Sigman v. Town of Chapel Hill*, 161 F.3d 782 (4th Cir. 1998) to support its

conclusion that "Defendant acted reasonably in using deadly force and there was

no violation of Decedent's Fourth Amendment Constitutional right." JA157.

However, a review of the pertinent facts of *Sigman* entirely support the conclusion

that the District Court should have denied Appellee's Motion for Summary

Judgment as to Count 1. The District Court ignored the significant difference

between the facts of that case that led the Fourth Circuit to find that the officers in

that case were entitled to qualified immunity. The plaintiff in the *Sigman* case

possessed a knife but the *Sigman* case does not state that the use of force, when a

person has a knife, is always reasonable and that an officer is always entitled to

qualified immunity in such situations. In *Sigman*, the police officers knew the

suspect from prior encounters and likewise had many interactions with him before

they shot him. The Fourth Circuit sets forth all of these facts when it announced its

decision:

> On the record before us, it is undisputed that, at the moment that
> Sigman stepped out of the house, Officer Riddle had ample
> knowledge of Sigman's dangerousness. Riddle knew that Sigman had
> a knife and was enraged inside the house, cutting himself. He knew
> that Sigman had been drinking and throwing things. He knew that
> Sigman was willing to use his knife on others because Sigman had
> slashed at him through the window. He knew that Sigman had made
> threats on his life, on his fellow officers' lives, and on Donna
> Solomon's life. And he knew that Sigman had not previously
> responded to his requests to calm down or come out of the house.

> Furthermore, when Sigman emerged from the house, he did not obey the officers' commands. Rather, he took a number of steps towards Officer Riddle. Riddle, and all of the officers at the scene, perceived that Sigman was holding a knife as he moved forward towards Officer Riddle, and the crowd behind Riddle was "taunting [Sigman] to continue." It is undisputed that the atmosphere was volatile and threatening.

*Id*. at 787.

These facts are clearly distinguishable from the facts of this case and the actions of Peyton Ham, after Appellee Azzari initially shot him, came nowhere close to creating a similar "atmosphere that was volatile and threatening."  Peyton Ham was a sixteen-year-old who was clearly in crisis.  He never threatened to kill the officer, and certainly did not do so after the first round of shots wounded him. Peyton Ham was on his knees, wounded, and far enough away from Appellee Azzari that he clearly posed no harm to Appellee Azzari or anyone else.[7]  Instead of firing the second round of shots at Peyton, Appellee Azzari should have "asked him to surrender, called for backup or an ambulance, or retreated."  *See Harris*, 927 F.3d at 278.  This is particularly true since it was clear that back-up police

---

[7] Appellee Azzari has confirmed that he "did not observe any other people at the scene at the time."  *See* JA40-JA43.

22

officers were already at or near the scene.[8]  Instead, Appellee Azzari fired the shots that took Peyton Ham's life.

**3.    The District Court Prematurely Ruled on Appellee's Motion without Providing the Appellant with an Opportunity to Conduct Reasonable Discovery in this Case**

If the District Court was not inclined to deny the Appellee's Motion to Dismiss or, in the Alternative for Summary Judgment, the District Court should have at least deferred on ruling on the motion because the Appellant should have been provided an opportunity to conduct discovery in this matter before a ruling pursuant to F.R.C.P. 56(d).  A declaration, as provided in F.R.C.P. 56(d), was attached to Appellant's Opposition to the Motion to Dismiss in the District Court in support of a request for deferral.

The following is a brief summary of some of the specific bases for this request that were presented to the District Court.  The April 19, 2021 recorded

---

[8] Appellee Azzari stated in his April 19, 2021 statement that he was at the Maryland State Police Barracks in Leonardtown, Maryland when he received his initial radio call that prompted him to go to the scene.  This Barracks is approximately one-tenth (0.1) of a mile from the location where Peyton Ham was shot on April 13, 2021.  In addition, as depicted in the photograph attached hereto Appellant's Opposition to the Motion for Summary Judgment, another police vehicle can be scene arriving at the location of the shooting before Appellee Azzari fired the second round of shots at Peyton Ham.  JA103.  Finally, Appellee Azzari himself acknowledged in his April 19, 2021 statement that, after he fired the second round of shots, "I immediately returned to my vehicle and attempted to obtain my medical bag and chest shield.  As I turned back around, additional units had already arrived on-scene and had begun to render aid.  JA83-JA89.

statement of Appellee Azzari was obtained by Appellant as a result of a Maryland

Public Information Act request to the Maryland State Police.  See JA73-100.

However, in the statement it references an apparent photo or other visual depiction

of the location where the events of took place.  It is clear from the recorded

statement that Appellee Azzari drew on that photograph to indicate the various

locations where certain actions or inactions took place.  This photograph was not

received as part of the response to the Maryland Public Information Act request.

Appellant should be afforded the opportunity to request a copy of this photograph

through the Federal discovery rules.  This is particularly critical to this case

because the distance between Appellee Azzari and Peyton Ham at the time

Appellee Azzari fired the second round of shots that killed Peyton Ham is directly

relevant to whether he reasonably believed he was in danger.

      The Appellant has not been able to obtain the final autopsy report on the

death of her son, and only child, from the Chief Medical Examiner's office.  A

copy of the three denials of her requests by the State of Maryland Office of Chief

Medical Examiner, along with the fourth most recent request, were provided to the

District Court.  See JA106-114.  The District Court should have deferred on ruling

on the Motion and allowed Appellant to avail herself of the discovery rules of the

Federal Rules of Civil Procedure to obtain a copy of that report.  Appellant

reasonably believes that this report will support the finding that Peyton Ham was

on his knees when Appellee Azzari fired the second round of shots at him, further

supporting the fact that no reasonable officer could believe that a sixteen-year-old

boy, on his knees, over fifteen (15) feet away from the officer and possessing no

firearm, in any way posed a threat to Appellee Azzari. Appellant also intends to

retain an expert witness to review the final report but was unable to do so because

of the repeated denials of her requests for the final autopsy report.

As set forth above, Appellee Azzari has given conflicting statements about

facts that are directly material to his liability under 42 U.S.C. § 1983. In his

written declaration prepared in an effort to dismiss this Action, Appellee Azzari

claimed sixteen-year-old Peyton Ham stood up, holding a knife, and took a step

toward Appellee Azzari and that these actions caused Appellee Azzari to "fear[]

for his safety." In his prior verbal statement given six days after the death of

Peyton Ham, Appellee Azzari did not claim that Peyton Ham took a step toward

him. This change in his description of the facts certainly raises credibility issues.

The District Court found this irrelevant, but the Appellant should have the

opportunity to investigate and depose Appellee Azzari to explain what his true, and

accurate recollection of the events that occurred on April 13, 2021.[9]

---

[9] Appellee also references a written declaration by Kyle Simms that was to be attached to his Memorandum which was to be attached as Exhibit 2. However, the document labelled Exhibit 2 as filed with the Court is a duplicate photograph of the alleged knife referenced above. See JA44.

While the Maryland State Police has responded to the Appellant and Appellant's counsel's requests pursuant to a Maryland Public Information Act request, there are notable absences of information in those responses. These include: no records of Appellee Azzari's training other than firearms training, no records of any prior complaints against Appellee Azzari, no records of any disciplinary records for Appellee Azzari, no records of any psychological records relating to Appellee Azzari, no footage obtained from the Maryland State Police of any "Blink" camera footage or drone video footage, no results of any alcohol or drug testing of Appellee Azzari, and no in-car video footage of any Maryland State Troopers who were at the scene. All of these items were requested and Appellant should be allowed to exercise her rights under the applicable discovery rules to verify whether any such records exist, as they could be directly relevant to the material facts of this case and the credibility of the Appellee.

The fact that the District Court relied upon the *Anderson* case as one of the two primary cases further demonstrates the clear legal error in its January 10, 2023 Memorandum and Order because the District Court failed to recognize that the procedural posture of the *Anderson* case renders it inapplicable to the Appellee's Motion for Summary Judgment. In Anderson, the Fourth Circuit was considered the reasonableness of the officer's actions *after* the parties were fully afforded the opportunity to conduct discovery and *after* a full trial before a jury. The District

Court's hasty granting of summary judgment in the present case before any

discovery was allowed to even begin and without having the right to present this

case to a jury trial denied Appellant the same procedural rights that were afforded

to the plaintiffs in the *Anderson* case.

Similarly, while the *Sigman* opinion appears to address the granting of a

summary judgment motion, it is clear from the opinion that the plaintiff in that case

was allowed to conduct discovery before the District Court ruled against the

plaintiff.  This is apparent as there are multiple references to depositions taken in

that case.  *See Sigman*, 161 F.3d at 790, 791.  As set forth above and as presented

to the District Court previously, Appellant has a reasonable belief that a deposition

could yield additional evidence in this matter that would further demonstrate the

existence of material facts in dispute in this matter.  At the very least, this

Honorable Court should correct the District Court's legal error and at least provide

the Appellant with the opportunity to depose the witnesses in this case, particularly

the Appellee and other eyewitnesses to the death of Appellant's son.

The District Court's rejection of the request to defer was obviously based on

its error in determining that the only material facts in this case were that Peyton

possessed a knife and was fifteen to twenty-five feet away from the Appellee.  As

set forth above, this was an erroneous conclusion as there are many material facts

in this case that are in dispute.  If the District Court had properly considered all the

material facts in this case, it should have deferred its ruling on Appellee's dispositive motion, at the very least, to afford the Appellant an ability to properly discover the events that led to the death of her only child.

## CONCLUSION

It is clear from the District Court's January 10, 2023 Memorandum and Order that the District Court failed to discuss or apply the correct legal standard in its ruling to grant Appellee's Motion for Summary Judgment as to Appellant's § 1983 claim. The District Court's error in granting of summary judgment as to the other counts in the Appellant's Complaint were the basis of its granting of summary judgment as to the other state tort claims and survival action claim in Appellant's Complaint. When this Court applies the correct legal standard to the issues raised before the District Court, namely the holdings and findings of *Brockington*, *Harris* and *Jones*, it is clear that there are clear and genuine disputes of material fact in this case. The District Court erred when it granted Appellee's Motion for Summary Judgment and, when these disputes and the underlying facts are viewed in a light most favorable to the Appellant, it is clear that this Honorable Court should reverse the January 10, 2023 Order of the District Court and remand this case to the District Court to allow for discovery to proceed and for the scheduling of a trial in this matter.

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Pursuant to Local Rule 34(a), the Appellant, Kristee Boyle, respectfully requests that this Court grant her oral argument on the issues presented by this appeal.  An oral argument would allow the parties to fully develop and argue the issues raised in this appeal.

Respectfully Submitted,

/s/ Christopher T. Longmore
Christopher T. Longmore
Dugan, McKissick & Longmore, LLC
22738 Maple Road, Suite 210
Lexington Park, MD 20653
(301) 862-3764
chris@paxlawyers.com
*Attorney for Appellant*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ X ] this brief contains [7,162] words.

[    ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.      This brief complies with the typeface and type style requirements because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 365*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated:  June 26, 2023                          /s/ Christopher Longmore
                                                             *Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 26th day of June, 2023, I caused this Brief of

Appellant and Joint Appendix to be filed electronically with the Clerk of the Court

using the CM/ECF System, which will send notice of such filing to the following

registered CM/ECF users:

Amy E. Hott
Phillip M. Pickus
OFFICE OF THE ATTORNEY GENERAL OF MARYLAND
1201 Reisterstown Road
Pikesville, Maryland  21208
(410) 653-4435

*Counsel for Appellee*

/s/ Christopher Longmore
*Counsel for Appellant*